# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Kenneth Macek, Matthew Harner, Lionel Alicea, and Robert Walker, individually and on behalf of all others similarly situated, | Case No. _____ |
| *Plaintiff*, | |
| v. | **COMPLAINT—CLASS ACTION** |
| DraftKings, Inc.; Crown PA Gaming Inc. d/b/a DraftKings; Golden Nugget Online Gaming LLC, | JURY TRIAL DEMANDED |
| *Defendants*. | |

Plaintiffs Kenneth Macek, Matthew Harner, Avi Setton, Lionel Alicea, and Robert Walker ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendants DraftKings, Inc., Crown PA Gaming Inc. d/b/a DraftKings, and Golden Nugget Online Gaming LLC (collectively "DraftKings" or "Defendants"). Plaintiffs make the following allegations based on personal knowledge as to their own acts, and upon information and belief and the investigation of counsel as to all other matters.

## <u>INTRODUCTION</u>

1.      In October 2017, Pennsylvania passed a bill to legalize internet gambling. Today, both Pennsylvania's internet casino industry and online sports betting industry are among largest in the nation in terms of dollars bet annually.

2.      Online betting allows consumers to use mobile apps on their smartphones to bet on casino games or sports anywhere in a state where it is legal, at any time.

3.      While the industry started off a little slow, the popularity of internet gambling rapidly increased with the COVID-19 pandemic and has continued growing since.

1

4.      Today it is a massive industry. The Pennsylvania Gaming Control Board said that iGaming (online casino games), a market in which DraftKings is the most popular operator, reported over $2.18 billion of revenue in 2024.[1]

5.      Likewise, sportsbooks in Pennsylvania, among which DraftKings is also a leader, brought in almost $510 million in revenue in 2024 from wagers totaling $8.42 billion.[2]

6.      Meanwhile, over the past few years, signs of gambling addictions in Pennsylvania have skyrocketed.

7.      Online gambling is particularly dangerous for people developing and struggling with gambling addiction. As one industry expert put it, "America can survive sports betting. It survived illegal betting for years. Whether it can survive a casino on everyone's phone — that I can't answer. That might be the tipping point."[3]

8.      DraftKings is the most dominant player in Pennsylvania's internet gambling industry and has driven much of its growth over the past few years.

9.      As of the end of 2024, Hollywood Casino at Penn National, of which DraftKings is the largest operator-partner, reported that it had earned almost $821 million in revenue.

10.     Consumers can also use DraftKings's online casino in Connecticut, Michigan, New Jersey, and West Virginia. DraftKings has the largest or one of the largest online casinos in each of these states as well and is constantly lobbying more states to legalize online casino gambling.

---

[1] Pennsylvania Gaming Control Board, *Press Release: PA Gaming Control Board Reports Record High Gaming Revenue for 2024*, (Jan. 21, 2025) https://gamingcontrolboard.pa.gov/news-and-transparency/press-release/pa-gaming-control-board-reports-record-high-gaming-revenue-2024se/pa-gaming-control-board-reports-record-high-gaming-revenue-2024 (last visited Mar. 24, 2025).
[2] *Id.*
[3] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, Rolling Stone, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).

11.    Plaintiffs bring this action because DraftKings is earning enormous amounts of revenue by misleading its customers into signing up for and repeatedly engaging with a known addictive product through its online casino and sportsbook.

12.    DraftKings's business model has long involved pushing the boundaries of the law, misleading consumers, and luring naïve gamblers into developing addictions.

13.    DraftKings attracts new customers and keeps existing customers coming back by advertising an all-upside gambling experience, falsely promising customers that they will get free money that they can wager without any risk. In reality, DraftKings has created an all-upside opportunity only for itself: to obtain the promised cash bonus, the hidden terms of its promotions require customers to deposit and gamble their own substantial funds that they almost always lose. DraftKings also engages in other undisclosed manipulations, enticing those customers who are able to initially win to make worse and worse bets until their funds are exhausted. Even in the rare instances where customers satisfy the promotions' draconian playthrough and wagering requirements, DraftKings does not distribute its awards in the form of cash (as promised in its ads) but as non-withdrawable betting "credits" that must be bet on DraftKings's platform.

14.    Many customers have gambled and lost more money than they intended as a result of these deceptive and unfair promotions, and some customers have developed gambling addictions and lost thousands or—in the case of some of the Plaintiffs—hundreds of thousands of dollars.

15.    One of DraftKings's deceptive practices is a promotion that promises customers the chance to place bets at no risk to them ("Risk-Free Bet" or "No Sweat Bet").

16.    These purportedly no-risk bets, however, are not as advertised. The promotion

requires that the customer deposit funds and place the bet with their own money. If a customer loses their bet, DraftKings does not return the customer to his or her original position. That is because DraftKings does not credit its customers' accounts with U.S. dollars in the same amount that the customer wagered. Instead, DraftKings awards expiring "Bonus Bets" that cannot be withdrawn or converted into cash.

17.    DraftKings's award of "Bonus Bets" when a customer's original bet loses does not make the original bet "Risk-Free" as advertised. Because "Bonus Bets" cannot be withdrawn for cash, a customer must both wager and win a bet placed with a "Bonus Bet" before they have any cash value. Moreover, if a customer does not use the "Bonus Bets" to place wagers within 7 days after DraftKings awards them, they expire.

18.    Furthermore, wagers made with "Bonus Bets" are not paid out like wagers made with U.S. dollars. A winning $100 bet made with U.S. dollars at even odds recovers the $100 stake plus the $100 winnings less the sportsbook's cut (known as the "vig" or "rake") of ~9%. Accordingly, a winning $100 bet made with U.S. dollars at even odds results in a payment of approximately $191. By contrast, a winning bet made with a $100 "Bonus Bet" converts only to $100 U.S. dollars less vig—*i.e.*, a payment of approximately $91.

19.    Thus, the new customer responding to the "no-risk" advertisement can only get *some* of their money back, and only if they win their second bet. Far from "risk free," DraftKings conditions the mere partial repayment on the unknowable outcome of a sports bet. That is inherently risky. And even if the customer wins the second wager, they will not recoup their initial deposit unless they get lucky on a long-odds bet with a payout high enough to compensate for DraftKings's vig.

20.    The "Bonus Bet" is thus worth significantly less than the initial bet, meaning that

the money that DraftKings induced the customer to deposit was never in fact "risk-free" as advertised.

21.    DraftKings further engages in deceptive practices through its near-ubiquitous advertisements that offer to match a new sportsbook customer's first deposit up to $1,000 (the "$1,000 Sportsbook Deposit Promotion"). This promotion, too, is misleading and inaccurate.

22.    Undisclosed on the face of these advertisements, a new customer cannot receive the maximum $1,000 unless the customer: (i) makes an initial lump sum deposit of $5,000 (*i.e.* 5x the $1,000 advertised), (ii) wagers $25,000 in 90 days (*i.e.* 25x the initial $5,000 deposit), and (iii) only wagers on certain long-shot bets that customers have low odds of winning. Even then, just like with the "risk free" bets, DraftKings does not distribute awards in the form of withdrawable cash. Instead, customers receive betting credits that they cannot redeem for cash and that must be wagered and won on DraftKings's online sportsbook before they have any value.

23.    Perhaps DraftKings's most deceptive scheme is its "Casino Deposit Match Promotion." Through this promotion, DraftKings lures new customers to its online casino with the promise of thousands of dollars in bonuses. In reality, these customers are tricked into opting into a deposit match promotion with confusing and nearly-impossible-to-satisfy terms. **These opaque terms require customers to wager as much as <u>$200,000 within 7 days</u> to obtain $2,000 in non-withdrawable credits.**

24.    Compounding the deception, and undisclosed from the ads promoting this offer, these terms grant DraftKings the right to take all of a customer's money—including all of the customer's winnings—if they begin but fail to wager the obscene amount of money necessary to satisfy the promotion's near-impossible wagering requirements.

25.     DraftKings's advertisements for the Casino Deposit Match Promotion use large print and clear language that promise customers free money if they make a deposit and wager in the online casino. In reality, this promotion ends up only one of two ways: customers either lose their initial deposit because they are unable or unwilling to satisfy the unreasonable play-through requirements that DraftKings only reveals to customers *after* they have begun the promotion, or they make far more bets than they initially intended and risk developing a dangerous gambling addiction through repeated exposure to DraftKings's known addictive product.

26.     Rather than meeting customers' reasonable expectation that they will be able to walk away with whatever portion of their deposit they did not lose on bets, DraftKings surprises customers by taking their deposit, the matching bonus funds, and any winnings that the customers earned.

27.     Despite DraftKings's promise to customers that they will get up to $2,000 in free money if they make a deposit on DraftKings's online casino, most customers walk away with nothing.

28.     The hidden and confusing terms of DraftKings's Casino Deposit Match Promotion regularly result in consumers losing all the money they deposited or unwittingly forfeiting funds.

29.     And consumers who do try to satisfy the playthrough requirements often develop addictions that, as DraftKings intends, result in them gambling far beyond their means on DraftKings's online casino.

30.     Sometimes consumers are not even losing their money because they gambled it away but simply because DraftKings treats them as having forfeited it—often a thousand

dollars or more—just because they attempted to opt out of the deposit match promotion.

31.    When consumers ask DraftKings for their money back, DraftKings rebuffs them, and tells them they should have more carefully parsed the long and confusing terms, that, as described below, are not disclosed on the face of the advertisements promoting the Casino Deposit Match Promotion, are not ever clearly disclosed before customers opt-in to the Casino Deposit Match Promotion, and are unclear even on close examination.

32.    Due to DraftKings's market dominance in a regulated industry, customers trust that the company will comport itself fairly and run promotions that are as-advertised.

33.    DraftKings is taking advantage of consumers' misplaced trust and tricking them into making a Hobson's choice between gambling so much they are likely to develop an addiction—and lose a significant amount of money in the process—or walking away from all of the money they initially deposited.

34.    No customer could reasonably expect this would happen to them, even if they carefully read the terms associated with this promotion.

35.    Countless customers have lost money through DraftKings's confusing promotional schemes. Many of these have reported DraftKings's deceptive practices to state gambling regulators. However, despite—or because of—DraftKings's knowledge of how many people it has deceived, and the amount of money it has misappropriated from customers through its deceptive conduct, DraftKings continues to mislead customers.

## **PARTIES**

36.    Plaintiff Robert Walker is a resident of Delaware County, Pennsylvania. Plaintiff Walker began using DraftKings to place sports bets in January 2020 with the username "robwalker76". Plaintiff Walker saw advertisements promoting the $1,000 Sportsbook Deposit

7

Promotion and offering "Risk-Free Bets" on television and social media, and directly via marketing emails. In response to the advertisements for the $1,000 Sportsbook Deposit Promotion, Plaintiff Walker created and funded his DraftKings Sportsbook account and made bets on the DraftKings Sportsbook. Similarly, in response to the advertisements for "Risk-Free" bets, Plaintiff Walker made bets on the DraftKings Sportsbook believing they were without risk.

37.     Plaintiff Kenneth Macek is a resident of Allegheny County, Pennsylvania. Plaintiff Macek began using both DraftKings Sportsbook and Casino offerings in November of 2020 with the username "GolfProX." Plaintiff Macek saw advertisements for the $1,000 Sportsbook Deposit Promotion, and for "Risk-Free" bets, and Casino Deposit Match Promotion. In response to these ads for the $1,000 Sportsbook Deposit Promotion, Plaintiff Macek created and funded his DraftKings Sportsbook account and made bets on the DraftKings Sportsbook. In response to these ads for the Casino Match Deposit Promotion, Plaintiff Macek created and funded his DraftKings Casino account and made bets on the DraftKings Casino. In response to ads for "Risk-Free" bets, Plaintiff Macek made bets on the DraftKings Sportsbook believing they were without risk.

38.     Plaintiff Matthew Harner is a resident of Berks County, Pennsylvania. Plaintiff Harner created an account and gambled on the DraftKings and Golden Nugget Casinos in 2024, with the usernames "mharner02" (DraftKings) and "huey2323" (Golden Nugget). Plaintiff Harner saw advertisements for the Casino Deposit Match Promotion. In response to these ads, Plaintiff Harner created and funded his DraftKings and Golden Nugget Casino accounts and made bets on DraftKings's and Golden Nugget's Casinos. Plaintiff Harner lost approximately $57,000 on DraftKings over a few months.

39.     Plaintiff Avi Setton is a resident of Lehigh County, Pennsylvania. Plaintiff

Setton created his account on DraftKings's Sportsbook in December of 2019 with the username

"balthazar444". Plaintiff Setton saw advertising for the $1,000 Sportsbook Deposit Promotion

and for Risk-Free bets around this time. Based on the misleading statements in these

advertisements, Plaintiff Setton created and funded his DraftKings Sportsbook account and

made bets on the DraftKings Sportsbook. Then, in the summer of 2020, Plaintiff Setton opened

and funded his account on DraftKings's Casino because he saw advertising for the Casino

Deposit Match Promotion described below.

40.     Plaintiff Lionel Alicea is a resident of Lackawanna County, Pennsylvania.

Plaintiff Alicea moved to Pennsylvania in early 2024. Shortly after he moved to Pennsylvania,

Plaintiff Alicea created an account on the Golden Nugget Casino in May 2024 after seeing

deceptive advertisements for its Casino Deposit Match Promotion on his social media feeds. In

response to these ads, Plaintiff Alicea created and funded his Golden Nugget Casino account

and made bets on the Golden Nugget Casino.  Plaintiff Alicea also created an account on the

DraftKings Casino in June 2024 after seeing similar deceptive advertisements for a Casino

Deposit Match Promotion via email and on his social media feeds. In response to these ads,

Plaintiff Alicea created and funded his DraftKings Casino account and made bets on the

DraftKings Casino. Since signing up, Plaintiff Alicea lost over $39,000 on the DraftKings

Casino and $19,000 on the Golden Nugget Casino.

41.     Defendant DraftKings, Inc. is a Nevada gambling and entertainment corporation

headquartered in Boston, Massachusetts. As of April 2020, DraftKings, Inc. is a publicly traded

company that trades on the Nasdaq Stock Exchange.

42.     Defendant Golden Nugget Online Gaming LLC ("Golden Nugget") is a limited

liability company formed under the laws of Delaware with its principal place of business in

Boston Massachusetts. DraftKings purchased Golden Nugget's predecessor, Golden Nugget

Online Gaming, Inc., in May 2022. Since that time, Golden Nugget has been, and continues to

be, a wholly owned subsidiary of DraftKings, Inc. DraftKings, Inc. continues to operate a

separately branded Golden Nugget online casino in Pennsylvania through Golden Nugget.

43.    Defendant Crown PA Gaming Inc. is a privately held company incorporated in

Delaware with its principal place of business in Boston, Massachusetts. Crown PA Gaming Inc.

is a subsidiary of DraftKings, Inc. and is responsible for conducting some portion of

DraftKings, Inc.'s business in Pennsylvania.

## JURISDICTION AND VENUE

44.    This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. § 1332(d)(2), because, given the number of DraftKings's customers and the

prevalence of the promotions and practices at issue, the matter in controversy exceeds

$5,000,000, exclusive of interest and costs, and this is a class action in which at least one

member of the class is a citizen of a different state than Defendants. The number of members of

the proposed class in aggregate exceeds 100 users. 28 U.S.C. § 1332(d)(5)(B).

45.    This Court has personal jurisdiction over Defendants because they regularly

conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or

derive substantial revenue from products and/or services provided to persons in this District.

46.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because

Defendant does business in this District and because a substantial part of the events or

omissions giving rise to the claims occurred in this District.

10

## FACTUAL ALLEGATIONS

### A. Online Gambling in Pennsylvania and DraftKings's Dominant Industry Position

47.    In October 2017, Pennsylvania became the fourth state to legalize online gambling, paving the way for licensed operators to offer online slots, table games, and other forms of digital casino wagering through mobile smartphone apps in every corner of the state.

48.    Pennsylvania's gambling market is regulated by the Pennsylvania Gaming Control Board, which imposes rules and requirements to ensure fairness, transparency, and consumer protection.

49.    In 2018, the United States Supreme Court held, in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), that a federal law could not prohibit Pennsylvania and other states from legalizing sports betting within their borders.

50.    As a result of this decision, the market for sports betting has exploded. The total U.S. revenue of sportsbooks exploded from $430 million in 2018 to $10.92 billion in 2023.[4]

51.    Pennsylvania remains one of the most popular sports betting states in the country, with over $8.42 billion wagered on sports bets in 2024 alone.[5]

52.    DraftKings began operating in Pennsylvania shortly after the Supreme Court struck down the Professional and Amateur Sports Protection Act, giving the company a head start in the nascent online sports betting market.

53.    DraftKings is perennially among the top online sportsbooks nationally in terms of annual revenue. In 2024, DraftKings was the second largest sportsbook by revenue in

---

[4] Mike Reynolds, *American Gaming Association: Legal sports betting hits record revenue in 2023*, S&P GLOBAL, Feb. 21, 2024, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/american -gaming-association-legal-sports-betting-hits-record-revenue-in-2023-80522087 (last visited Nov. 27, 2024).
[5] *See supra* note 1.

Pennsylvania and the largest operator of online gaming.

54.    DraftKings reinvests a lot of its revenue in hooking more users on sports betting.

55.    For example, DraftKings's sales and marketing expenses totaled $1.2 billion in 2023.[6] To promote its online sportsbook, DraftKings ran ads that showcased various promotions that DraftKings ran across multiple marketing channels, including TV, radio, Podcast, social media, Internet, email, billboard, paid partnerships, and print advertising. These promotions typically targeted new users through "bonus" offers that promised bonuses and "no-risk" bets to new customers that signed up, made their first deposit, and satisfied various deceptive playthrough requirements.

56.    In addition, DraftKings paid affiliate marketers hundreds of dollars for each new customer that signed up for DraftKings's gambling platforms sportsbook in response to advertisements for its bonus promotions.

57.    As DraftKings has repeatedly said in its annual 10–K reports, "Achieving growth in our community of users may require us to increasingly engage in sophisticated and costly sales and marketing efforts."

58.    DraftKings's target audience for these marketing efforts is new users and casual gamblers—those who are most likely to lose money and who might turn into high-value addictive gamblers losing thousands of dollars a month to DraftKings.

59.    In fact, DraftKings, will often limit or even outright ban "sharps," gamblers who are sophisticated and make too many winning bets in its sports book.

60.    Meanwhile naïve losing consumers are targeted with more and more deceiving

---

[6] https://www.statista.com/statistics/1379464/sales-marketing-expenses-draftkings-worldwide/#:~:text=In%202023%2C%20the%20fantasy%20sports,based%20company%20spent%20in%202020

promotions.

61.    DraftKings's CEO has admitted that the company is only interested in serving bettors who are likely to lose money on its platform: "This is an entertainment activity. People who are doing this for profit are not the people we want."[7]

62.    DraftKings is not, however, following a traditional "entertainment" industry business model of trying to "entertain" as many customers as possible.

63.    As further described below, DraftKings designs its promotional offers to lure in and identify those customers most likely to become consistent gamblers.

64.    These promotional offers include promises to match customers' deposits and offers of "Risk-Free" (later termed "No Sweat") bets. But rather than coming through on the large-print offers made to new users in advertisements for these promotions, DraftKings contradicts the large-print offers by inserting difficult to read, legally-opaque fine print terms hidden behind hyperlinks that are only available when a user is about to opt-in to the promotions and, thereafter, by enforcing complicated rules that DraftKings knows will be overlooked and misunderstood.

65.    Not only do these false promises lure consumers into opening and funding accounts on DraftKings, but they also lure many users into wagering larger amounts and more frequently than they otherwise would.

66.    This was DraftKings's goal all along. DraftKings knows that the money it invests to sign up a customer often pays for itself many times over. According to McKinsey partner Dan Singer, "When a market opens up, you've got to get out there and start acquiring,

---

[7] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, ROLLING STONE, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).

because being the first book that someone downloads gives you roughly twice as much action as being the second or the third."[8]

67.    As the sports betting market in Pennsylvania became more saturated, DraftKings began turning its attention from recruiting new customers at any cost to retaining the most vulnerable customers it already has hooked on its platform.

68.    The customer retention stage is much more profitable for DraftKings than the initial customer acquisition stage.[9]

69.    Originally, DraftKings and other sportsbooks used to make good on the promises they made to new users of cash deposit matches and no-risk bets—where you get cash back if you lose. However, to do so, they hemorrhaged profit as they entered new markets.

70.    As the Washington Post has reported, "the days of companies giving away straightforward deposit matches worth thousands of dollars are largely over. Instead, sportsbooks are deploying increasingly complicated deals that advertise a big dollar figure but are far less generous [than advertised] upon closer examination."[10]

71.    Today, while DraftKings still makes the same bold promises in their ads, it now gives users "Bonus Bets" and "DK Dollars" that cannot be cashed out and must be used on the platform in accordance with complicated and unintuitive terms.

72.    In an online gambling marketplace saturated by sign-up promotions targeting vulnerable individuals with big "free" or "risk-free" dollar figures—some of which are truly

---

[8] Danny Funt, *Sportsbooks Are Sweating Their Billion Dollar Marketing Bet*, WASHINGTON POST, Sept. 27, 2022, https://www.washingtonpost.com/sports/2022/09/27/caesars-fanduel-draftkings-commercials/ (last visited Nov. 15, 2024).
[9] *Online Sportsbook: A Shift In Player Retention?*, GAMING AMERICA, Mar. 17, 2023 https://gamingamerica.com/magazine/7296/online-sportsbook-a-shift-in-player-retention (last visited Nov. 15, 2024).
[10] *Supra* note 8.

risk-free and some of which, like those offered by DraftKings, are not—consumer confusion reigns. DraftKings exploits that confusion.

**B.  DraftKings's Pivot to Online Casino Gambling**

73.     Online casino gambling has become a significant component of Pennsylvania's gaming industry, generating billions in revenue and attracting millions of consumers.

74.     In 2020, as in-person entertainment dropped during the COVID-19 pandemic and online gambling boomed, DraftKings added online casino gambling to its offerings in Pennsylvania.

75.     DraftKings sees online casino gambling as an important area for growth because it is more predictable and therefore profitable compared to handling sports betting, where the company faces the risk of uncontrolled outcomes and dynamic—and therefore error-prone—odds.[11]

76.     Driven by this business prerogative, DraftKings has established itself as the most dominant player in the nascent national online casino betting market.

77.     DraftKings has done so by leveraging its brand recognition and existing user base, as well as aggressive marketing, celebrity endorsements, and promotional offers.

78.     DraftKings regularly has the highest monthly market share of any online casino platform in Pennsylvania in terms of monthly revenue.

79.     In Connecticut, Michigan, New Jersey, and West Virginia, the other states where DraftKings operates online casino gambling, it has a similarly dominant market position.

80.     For example, in January 2025, DraftKings's online casino partner in

---

[11] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, Rolling Stone, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).

Pennsylvania, Hollywood Casino at Penn National Race Course, reported a monthly gross revenue of over $79 million from online casino gaming, almost $22 million more than the closest competitor.[12]

81.     DraftKings's brand recognition and market position allows it to exert considerable influence over consumer expectations and industry practices in the online gambling ecosystem and to get away with practices that smaller, less-established operators could not.

82.     DraftKings's large customer base of online sports bettors can use the same funds they deposit to the app for sports betting to try out online casino gambling, and DraftKings often entices them to do so with appealing-sounding promotions.

83.     DraftKings also portrays itself as a fair, transparent, and consumer-friendly operator, encouraging users to participate in its promotions and deposit funds into its platform.

84.     These promotions often come with complex, opaque, and poorly disclosed terms and conditions, which are concealed from consumers until after they have made their deposits to the site.

85.     Moreover, DraftKings intentionally designs its marketing and platform interface to minimize the likelihood that users will engage with the terms of use and playthrough requirements.

86.     Consumer psychology research has identified several factors that decrease people's likeliness to read the fine print of consumer contracts.[13] First, researchers point out that

---

[12] *PA Gaming Control Board Announces Revenue for January Up Nearly 11%*, PENNSYLVANIA GAMING CONTROL BOARD, Feb. 20, 2025, https://gamingcontrolboard.pa.gov/news-and-transparency/press-release/pa-gaming-control-board-announces-revenue-january-nearly-11 (last visited March 14, 2025).
[13] Meirav Furth-Matzkin & Roseanna Sommers, , *Fool Me Once, Shame On Me: How Consumers And Lawyers Perceive The Fine Print In Deception Cases*, HARVARD JOHN M. OLIN CENTER FOR LAW,

when contract forms are intentionally made not user-friendly, consumers are less likely to engage with them.

87.    For example, researchers at New York University note that "Font sizes are often very small and the clauses within sentences can be very long which can make it physically difficult and taxing for consumers to read."[14]

88.    The terms of DraftKings's Casino Deposit Match Promotion are over fifteen hundred words long with small font sizes, lengthy sentences, legalistic language, and confusing organization that all make it excessively taxing for users to follow.

89.    The NYU researchers' paper goes on to mention that "Even if consumers were able to dissect the legalese in which contracts are written, the process of doing so would be exceedingly difficult especially since relevant passages are often buried in other language."

90.    DraftKings only reveals the truth of its unfavorable promotions after multiple paragraphs describing age and location requirements for betting on their platform. Even if a user is able to hunt down language that describes how the promotion actually works, it is written in a way that makes it unlikely that a layperson—who is eager to get gambling—will understand.

91.    Furthermore, according to the NYU researchers, "consumers will also often have difficulty imagining problems that might arise. That is, scenarios under which things can go

---

ECONOMICS, AND BUSINESS - FELLOWS' DISCUSSION PAPER SERIES, June 2018, https://www.law.harvard.edu/programs/olin_center/felows_papers/pdf/Furth_82.pdf (last visited Dec. 10, 2024); Florencia Marotta-Wurgler, , *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's "Principles of the Law of Software Contracts"*, U. CHI. L. REV., Feb. 6, 2011, https://lawreview.uchicago.edu/sites/default/files/78-1-Increased%20Disclosure%20in%20Software%20Contracts-Marotta-Wurgler.pdf (last visited Dec. 10, 2024).
[14] Debra Pogrund Stark & Jessica M. Choplin, *A License to Deceive: Enforcing Contractual Myths Despite Consumer Psychological Realities*, NYU JOURNAL OF L. AND BUS., Feb. 9, 2009, https://papers.ssrn.com/-sol3/papers.cfm?abstract_id=1340166 (last visited Dec. 10, 2024).

wrong never enter their minds."

92.    After exposure to DraftKings promising headlines, consumers are unlikely to predict that redeeming these promotions will entail such onerous requirements and fruitless rewards.

93.    The authors also write that "even if some consumers manage to foresee the possibility of potential negative consequences, they will often be overly optimistic in assessing the probability of those negative consequences once they have invested even a small amount of time, effort, or other resources pursuing a goal."

94.    By the time a user is presented with the full terms of a promotion, they have grown excited about DraftKings's alluring promises and have put time and effort into navigating to the platform's compelling offer.

95.    Moreover, research shows that social norms often discourage reading the fine print of a contract. Consumers believe that DraftKings, a company operating in a heavily regulated industry, can be trusted for the promises it makes in its advertisements. Consumers do not think, therefore, that they need to carefully read pages of fine print to protect themselves.

96.    Finally, DraftKings's contract is one of adhesion with terms that are non-negotiable, "[a]nother major reason why people might not read the contracts that they sign… [is that [t]he consumers' choice is to accept the offered agreement or go elsewhere." DraftKings customers understand that reading the fine print will not lend itself to mediating a more favorable deal.

97.    DraftKings exploits these factors and misleads consumers about material aspects of its promotions, secure in the knowledge that few consumers will notice if the fine print contradicts what they reasonably believed they had signed up for.

98.     Plaintiffs Macek, Setton, Harner, Alicea, and Walker, like many young men targeted by DraftKings, have lost a significant amount of money gambling on DraftKings's online platform.

## C.  DraftKings's Casino Deposit Match Promotion

99.     DraftKings offers a series of promotions that promise to match a new customer's first deposit into their DraftKings casino account. While the offers have varied monetarily, DraftKings made materially similar promises with opaque and onerous requirements.

100.     These promotions have been titled "Casino Deposit Match" and are offered to both new and existing DraftKings users.

101.     DraftKings advertises the Casino Deposit Match Promotion on billboards and in digital media as well as directly to people on its own platform.

102.     These offers lure those familiar with DraftKings's sportsbook to try its online casino by promising to match 100% of a customer's deposit up to $2,000 (or up to $1,000 on Golden Nugget).

103.     The advertisements have eye-catching promises in large print of a massive cash bonus matching a deposit.



*Figure 1: example advertisement for the Casino Deposit Match Promotion promulgated on digital media in Pennsylvania*

104. Conspicuously missing from these advertisements is any mention of the terms and conditions that will eventually lead most users to regret ever making a deposit.

105. Frequently Plaintiffs saw ads like these within the DraftKings app itself, which did not disclose the terms of the promotion.

106. Other advertisements for the promotion have tokens raining down and fireworks.



*Figure 2: Example advertisement for the Golden Nugget Casino Deposit Match Promotion that is substantially similar to those that Plaintiffs viewed before first opting into the promotion.*

107. Even when these advertisements did include some terms, they were in very small, often unreadable print and did not include the most material terms regarding the promotion, described below.



*Figure 3: Another example advertisement for the Casino Deposit Match Promotion with the full terms obscured, promulgated on digital media throughout Pennsylvania around in 2022 and 2023 and substantially similar to the advertisements Plaintiffs saw and relied on when opting into the Casino Deposit Match Promotion.*

108.    One television advertisement for the promotion that ran in 2023 promised customers a "100% deposit match up to $2,000" for playing blackjack on DraftKings' online casino without audibly disclaiming the existence of a playthrough requirement or the fact that blackjack contributes toward the requirement at only a 20% rate. Some, but not all, of the terms associated with the promotion were shown in tiny font at the bottom of the screen for the last five seconds of the advertisement but were too small and disappeared too quickly to actually be read.[15]

109.    Plaintiffs saw multiple ads substantially similar to these shortly before they first made a deposit and opted in to the Casino Deposit Match Promotion in the DraftKings app.

---

[15] Available at: https://www.ispot.tv/ad/23_E/draftkings-casino-home-of-blackjack (last accessed July 15, 2025).

110.    The promotional materials fail to communicate the true lengths to which a user
must go in order to receive any tangible benefit from the promotion and the fact that a user's
entire deposit will be forfeited should they choose to opt out or fail to meet the nearly-
impossible-to-satisfy wagering requirements.

111.    DraftKings's Casino Deposit Match Promotions are subject to egregious
playthrough requirements, often set at 10x or 15x the combined amount of the deposit and
bonus funds. Thus, to redeem a $2,000 bonus at a 10x playthrough requirement (a common
DraftKings offer), a user would need to wager at least $40,000 (10x playthrough of BOTH the
$2,000 deposit and the $2,000 bonus).

112.    Additionally, these promotions have a seven-day window for users to satisfy the
playthrough requirements.

113.    Accounting for this, a user would have to wager over $5,700 every day for a
week in order to satisfy the $2,000 bonus playthrough requirement.

114.    DraftKings further manipulates the terms such that not all wagers contribute
equally to the playthrough requirement. In fact, casino games with the most favorable statistical
returns to users, like table games, contribute to the playthrough requirements at rates
significantly lower than other casino games where users have a much lower chance of winning,
like slot machines. For example, blackjack, a game known for its close-to-even returns, counts
at a rate of just 20% towards the playthrough requirement. In other words, if a user bet $100 on
a hand of blackjack, only $20 would count towards their playthrough requirement.

115.    For a user to satisfy a $40,000 playthrough requirement playing just blackjack,
they have to gamble a minimum of $200,000 in a seven-day timeframe.

116.    This means that, assuming a hand of blackjack takes ~1 minute, a user betting

$50 every hand would have to spend more than 66 hours in a 7-day period playing blackjack to satisfy the playthrough requirement. That amounts to almost ten hours of blackjack a day, without stopping to eat or go to the bathroom.

117.     As described below, the fact that users must spend a tremendous amount of time gambling in a short timespan is an intentional aspect of the promotions' design. DraftKings intends for customers to spend enough time engaging in habit-forming gambling behavior that they do, in fact, form a habit.

118.     DraftKings knew, or should have known, that its customers would not find or understand the proviso, hidden deep in the promotions' terms (and not included in even the small print accompanying many advertisements for the promotions), that casino games contribute to the playthrough requirement at varying rates and that the most favorable games contribute only marginally to the playthrough.

119.     The hard-to-understand terms and conditions attempt to describe the order by which a customer's wagers dissipate the funds in a customer's account: "Order of Funds for wagering [are]: (1) customer's initial qualifying deposited funds (the Original Deposit) are wagered first prior to casino bonus funds, (2) winnings accrued during the play-through of the Original Deposit, (3) bonus amount."

120.     Despite these terms providing that each pool of money will be treated differently, DraftKings shows only one number in a customer's account: the total of their deposit, additional winnings, and bonus.

121.     The "order of funds for wagering" provision is paired with language that states, "Failure to complete the play-through requirement, defined below, of the Original Deposit and Casino Bonus Funds within seven (7) days (the "Play-through Period") of the Casino Bonus

Funds being credited to your account will void the award. This will result in forfeiture of any

wagered and lost portion of the Original Deposit, Casino Bonus Funds and any accumulated

winnings."

122.     DraftKings claims this language establishes that, in the event a user fails to

complete the playthrough within seven days or decides to opt out of the promotion after

realizing it is impossible to satisfy, they stand to lose their entire original deposit and any

money they have won wagering it—not just the promotion's bonus funds.

123.     In practice this means that, if a user deposited $2,000 and wagered it to win, say,

$500 before deciding that they cannot satisfy the playthrough requirement, their account

balance would be reset to $0; DraftKings would treat the customer's $2,000 worth of wagers as

having dissipated the original deposit to zero, and the $2,500 balance reflected in their account

as "accumulated winnings" that are subject to forfeiture.

124.     In other words, in this example, the customer is left with nothing—no initial

deposit, no matching bonus funds, and no winnings.

125.     DraftKings compounds the confusion by sometimes including in the terms, in

bold, the statement that "**At any point, a customer may decide to forfeit their bonus and

remove themselves from the promotion.**" But DraftKings fails to warn users that

"forfeit[ing]" their bonus will not leave them any better off than just allowing the promotion to

expire—or deleting the app and never returning—because once they place wagers equaling or

exceeding the amount of their initial deposit, no matter how much money remains in their

account, DraftKings treats all the funds as forfeitable if the playthrough is not met.

126.     A reasonable expectation, especially for gambling-naive customers, is that

failure to satisfy the requirements would result in a customer's account being reset to the

amount of their initial deposit, plus or minus any gambling wins or losses, sacrificing only the opportunity to get the matching bonus. DraftKings customers could not reasonably be expected to understand that their money was to be wagered in a specific order and treated differently after being wagered, particularly when their account balance reflected a single dollar amount and was not represented as separate "pools" of money to be treated differently.

127.    In many cases, customers who failed to satisfy the terms were shocked when their account balance was reset to zero, forfeiting even their initial deposit. Numerous individuals have reported this experience on Reddit, to the Better Business Bureau, and to state gambling regulators.

128.    When users discover that their deposit has been locked up in the Casino Deposit Match Promotion simply by placing a single bet in the casino, they are faced with either trying to recoup it by gambling an enormous amount in a short period of time or walking away from it.

129.    One Reddit user posted a detailed description in December 2023 of his experience with a "100% Casino Deposit Match".[16] After depositing $1,000 into DraftKings and playing hundreds of hands of blackjack, this user decided that the requirements were too onerous to complete, particularly given the negligible contribution of his blackjack playing to the playthrough. Deciding he was not willing to wager $100,000 on virtual blackjack in just seven days, this user navigated to the "bonus forfeiture" option. Without being asked to confirm or warned that he would be losing his entire initial deposit, this user's account balance was reset to zero. The user was shocked that "forfeiture" of the bonus included not just the promotional incentives and associated winnings, but his own $1,000 deposit.

---

[16] https://www.reddit.com/r/DraftKingsDiscussion/comments/18uj96p/bonus_forfeiture/

130.    A number of complaints to the Better Business Bureau reflect identical concerns about unknowingly forfeiting deposits associated with DraftKings's "Casino Deposit Match" promotions.[17] Other complaints to the Better Business Bureau reflect customers' confusion surrounding the varying contributions of different games to the playthrough and uncertainty about the meaning of a "15x playthrough."

131.    Furthermore, several individuals have reported this promotion to state gambling regulators.

132.    In fact, the Connecticut Department of Consumer Protection instituted an investigation into DraftKings's use of the Casino Deposit Match Promotion in 2023. On July 10, 2025, the Department announced that DraftKings had agreed to return millions of dollars to Connecticut consumers who used the promotion.[18]

133.    DraftKings also agreed to cease advertising the Casino Deposit Match Promotion and promotions like it in Connecticut unless it more conspicuously disclosed the playthrough requirements and the time within which a customer must meet them.

134.    Plaintiffs Macek, Setton, Alicea, and Harner were all deceived by DraftKings's advertising for the Casino Deposit Match Promotion. Each of these Plaintiffs deposited money and opted into it based on their reasonable belief that DraftKings would match their deposits.

135.    They all lost money as a result of the promotion when they failed to satisfy its onerous terms.

136.    Plaintiff Setton saw the advertisements and was induced by them to create his casino account and enter the promotion in summer 2020, shortly after DraftKings launched its

---

[17] https://www.bbb.org/us/ma/boston/profile/online-gaming/draftkings-inc-0021-134635/complaints.
[18] Available at: https://portal.ct.gov/dcp/-/media/dcp/gaming/pdfs/final-avc-draft-kings-2025.pdf?rev=d9312bcf734b4e1fa32e9791f7139d02&hash=93331C76D6D4A9C0C9D48A310E65F0D7 (last accessed: July 15, 2025).

casino in Pennsylvania. Plaintiff Setton believed the large print promises in ads he saw for the promotion and did not ever see the fine-print terms that resulted in him losing his initial deposit.

137.    Plaintiff Harner began gambling on DraftKings and Golden Nuggets online casinos in mid-2024 after seeing numerous advertisements for the deceptive Casino Deposit Match Promotion including advertisements that were substantially identical to those described above.

138.    Plaintiff Alicea was induced to begin gambling on DraftKings and Golden Nugget because of deposit match promotions he saw advertised by them on his social media feeds in May and June 2024.

139.    Plaintiff Alicea was made to believe, based on DraftKings's and Golden Nugget's false advertising for their promotions, that he could not lose money because his deposits would be matched after creating an account and making a deposit.

140.    The first time Plaintiff Macek used the Casino Deposit Match Promotion, in late 2020, he placed a bet without realizing it would tie his money up in the playthrough requirements. Upon realizing, he attempted to cancel out of the promotion without losing his money but was told by DraftKings that was not possible without forfeiting all of his winnings that were tied up in the promotion.

141.    This promotion worked as intended to inculcate problem gambling behaviors in Plaintiffs, including causing them to gamble a large amount in a short period of time, to chase their losses, and trapping them in a cycle of chasing hard-to-satisfy "free money" promotions.

**D.  DraftKings's "Risk-Free Bet" Promotions**

142.    DraftKings sportsbook offers a variety of promotions to new users that falsely state they can try out the platform without any risk of losing money. The dollar amount that can be placed "Risk-Free" or "No Sweat" varies but can be as much as $1,000.

143.    These tantalizing offers have been effective at persuading new users to open betting accounts they may not otherwise have opened and persuading existing users to wager amounts they may not otherwise have risked. That is what happened to Plaintiffs Macek, Setton, and Walker.

144.    After DraftKings lured Plaintiffs Macek, Setton, and Walker into placing bets based on the promise that they would be "risk-free," Plaintiffs discovered that the money they wagered had in fact been lost.

145.    Since at least 2020, DraftKings has advertised no-risk gambling promotions to countless people watching professional and collegiate sports on television.

146.    For those not watching televised sports, DraftKings ads for no-risk promotions were inescapable on Pennsylvania highways and public transportation.

147.    DraftKings has also advertised "risk-free" betting on the Twitter, Instagram, Facebook, and TikTok feeds of millions of potential users—including Plaintiffs—through direct advertising and paid partnerships with influencers.



*Figure 4: Post on Twitter (now X) from user @SoManyWays2Joey (host of a popular NHL podcast on a network partnered with DraftKings) advertising a "Risk-Free Bet" up to $1,000;*

*dated July 14, 2022. (https://x.com/SoManyWays2Joey/status/1547647893254746116)*

148. Finally, DraftKings directly sent app notifications and emails to its customers, including Plaintiffs Macek, Setton, and Walker, encouraging them to log in and place "risk-free" bets.

149. The bets placed pursuant to these promotions involve substantially more risk than DraftKings's promotional materials lead customers to believe. When a customer loses their initial bet, they are not in the same position as they were before placing the wager.

150. DraftKings's advertising misleadingly implied the contrary and concealed several key features of the no risk promotion that would have allowed customers to determine that using the promotions did, in fact, put them at risk of losing their money.

151. First, DraftKings misrepresented that a user could place a bet at no risk to themselves when there was necessarily risk, because a consumer cannot simply cash out a refund if they lose but instead must place another bet (the so-called "Bonus Bet") that they receive in the event they lost their original wager.

152. Second, DraftKings misleadingly implied that a user could be restored to their original position if their original bet lost because they would receive "Bonus Bets."

153. When a user places a bet as part of a no-risk promotion, they are wagering their own money and their account is debited the amount of the bet in U.S. dollars (in this case $100). If they lose, that money is not credited back to their account (as it would be if the bet was actually without risk), instead their account is credited with a "Bonus Bet" of the same amount. But a "Bonus Bet" is not worth its cash equivalent.

154. "Bonus Bets," have no cash value, are non-transferrable, have an expiration date, and cannot be withdrawn from the account.

155.    In order to turn a "Bonus Bet" into U.S. dollars that can make them whole for their prior loss, a user must use the "Bonus Bet" to place an additional wager within the specified time limit *and win*.

156.    Furthermore, even when a customer places and wins a "Bonus Bet", they do not receive the stake back—which is what DraftKings purportedly gave them to make up for their loss. For example, if a customer uses a $100 "Bonus Bet" on a winning wager with 50/50 odds, they are paid out $91 ($100 winnings, minus 9% vig, without a return of the $100 stake).

157.    And of course, there is no guarantee that a user will win the "Bonus Bet". If a "Bonus Bet" loses, the user will be left with nothing to show for their "risk-free" bet.

158.    DraftKings thus misrepresented there was no risk because there is the risk of losing all the money originally wagered. If a user loses their "Bonus Bet," they have no further means of recouping the initial amount they wagered.

159.    The false promise of "Risk-Free" and "No Sweat" bets was strategically and misleadingly designed to overcome new users' skepticism of gambling and to grab market share in the Pennsylvania sports betting industry.

160.    DraftKings was aware of the effects of such promises on users'—including Plaintiffs'—thinking: "If it's no-risk, why not bet more?"

161.    DraftKings deliberately tricked gambling-naive customers in Pennsylvania into falling for these promotions by not clearly communicating that those signing up for the no-risk promotions were, in fact, at risk of losing their money.

162.    Customers relying on their commonsense understanding of the "No Sweat" or "Risk-Free" offers on promotional materials—and not understanding the complex terms laid out several layers deep in fine print that contradict DraftKings's large-print promises—were

surprised to discover upon losing their bets that, in order to get *some* of their money back, they needed to make an additional, successful wager.

163.    DraftKings intentionally supplemented this confusion by using the dollar symbol ($) in its promotional materials.

164.    As alleged above, DraftKings advertised these no-risk bets to Pennsylvania users on numerous occasions, often targeted specifically to new customers or existing customers who had not placed a certain type of bet before.



*Figure 5: An April 2025 advertisement on DraftKings's website offering users a "Risk Free" bet up to $50.*



*Figure 6: A March 2024 advertisement promoting a "No Sweat Bet" of up to $1,000 for new customers used by DraftKings in various digital advertising media including on Twitter.*



*Figure 7: Twitter post, dated April 19, 2022, promoting a "Risk-Free Bet".*

*(https://x.com/DKSportsbook/status/1516544714425708552)*

165.    Most of these advertisements did not disclose any terms at all. Some advertisements for no-risk promotions include very small print referencing other terms.

166.    None of the advertisements clearly disclose all of the material terms or explain that a bet placed pursuant to the promotion is not, in fact, without risk.

167.    In fact, DraftKings goes to great lengths to make it onerous to even comprehend that fine print terms apply. First, the link to the terms of the promotion are not even made available to a user until after the customer has already logged into the platform in response to an off-platform advertisement for the promotion and clicked through several steps to get to the point of placing the supposedly no-risk bet.

168.    Even then, DraftKings buries the most important term—that if you lose your

original bet you only get an expiring "Bonus Bet" back which is not treated like a normal bet in how it is paid out. This vital information, which contradicts the large print promises that the customer is not at risk if they lose, only appears behind a tiny hyperlinked information symbol and then, if the symbol is clicked, deep in very small text below several blocks of much larger text focusing on other aspects of the promotion.



*Figure 8: Screenshot taken November 11, 2024, of the DraftKings user interface for placing a "No Sweat" bet. No terms and conditions are displayed. Instead, they are obscured by an easy-to-miss hyperlink, seen here as the almost imperceptible "i" with a small green circle around it next to "NBA No Sweat SGP or SGPx"*

169.    A user need not—and Plaintiffs Macek, Setton, and Walker did not—ever see

the full terms before opting in to the promotion on the basis of DraftKings's advertising that led them to believe they could place a bet with no risk.

170.    For example, a user could opt into a "No Sweat" NBA same game parlay on DraftKings by flipping the green switch in the app shown above without ever clicking the tiny "i" symbol linking to the promotion's full terms, which themselves bury the lead:






11:13

years of age or older (18+ if in DC/KY/NH/WY) (19+ if in CA-ONT). Any customer who is found to be ineligible to play on DraftKings (i.e., by way of self-exclusion from gambling, restriction due to employment, or otherwise) may not participate in this Promotion and immediately forfeits any bonus rewards which have been awarded under this Promotion.

In addition to the eligibility requirements set forth above and in the DraftKings Terms of Use, to participate in the Promotion, customers must (1) be a registered DraftKings Sportsbook customer with an active account; (2) receive an offer to participate in this Promotion; and (3) opt-in by clicking on the appropriate link or button within the Promotional Period.

NO SWEAT BET REDEMPTION

Upon completion of the promotion requirements, eligible customers will be awarded one (1) No Sweat Bet (the "Token"). Token valid only on 11/27 NBA bets (the "Qualifying Bet"). Minimum odds per leg of -500 or longer. Cashed-out bets and voided bets will void this Promotion. Bets placed with bonus rewards (including but not limited to Bonus Bets, Odds Boosts/Surges, Profit Boosts, etc.) are not valid. Token expires at the conclusion of the final 11/27 NBA game. Qualifying Bet must be placed using cash from your cash balance or DK Dollars. Maximum reward limits apply and vary by customer cohort. Maximum reward limits will be clearly and conspicuously disclosed to the customer upon opting in.

No Sweat Bet Tokens are single-use, non-withdrawable, and have no cash value. Must meet Qualifying Bet criteria and select Token BEFORE placing Qualifying Bet. Token only applies to Qualifying Bet. Reward issued only if Qualifying Bet loses after applying Token. Reward issued as Bonus Bet(s) based on the amount of losing Qualifying Bet. No Sweat Bets may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

REWARD LIMITATIONS

Bonus Bets are single-use, non-transferable, non-withdrawable, and have no cash value. Bonus Bets are valid for seven (7) days (168 hours) from the time they are credited to customers' accounts. Customers can choose when to use Bonus Bets and must select the Bonus Bet in their betslip before placing a wager. Failure to use a Bonus Bet will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus is placed at +100 odds and

---

11:13

betslip before placing a wager. Failure to use a Bonus Bet before expiration will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus bet is placed at +100 odds and wins, only the profit of $10 will be credited to the customer's account. Bonus Bets may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

GENERAL TERMS

Limit one (1) offer per customer. Customers must opt-in to this Promotion each time it is offered. Opting-in to this Promotion during a single day is only valid during that day and does not opt the customer into future periods. See DraftKings Sportsbook Terms of Use for information and limitations on wagering. Each customer will be notified when they have received an award by (1) a bell notification (this is a notification that displays as a bell icon on the home page of the DraftKings Sportsbook app and website that can be clicked on to view short confirmation copy and terms) and/or (2) an automatically triggered email if the customer successfully entered the promotion and completed the promotion requirements. Whether a customer has committed abuse of this Promotion, violated the Promotion Terms or DraftKings Terms of Use, will be determined by DraftKings in its sole discretion, for any reason or no reason at all. Should you wish to cancel your participation in this promotion at any time, please contact customer experience at sportsbook@draftkings.com. Upon cancellation, you may withdraw any remaining funds deposited in connection with this promotion subject to DraftKings Terms of Use. Any wager placed on DraftKings Sportsbook in connection with the promotion cannot be rescinded once it has been placed. However, any applicable bonus rewards in your account shall be void, subject to forfeiture, and may not be transferred or withdrawn. All promotions are subject to the DraftKings Terms of Use and Privacy Policy. By accepting any bonus rewards, registered customers agree to abide by the terms and conditions of this Promotion. Promotional offer is subject to regulatory approval. Void where prohibited by law. DraftKings account holders are responsible for any and all local, state, or federal taxes. DraftKings is not liable for computer or program malfunctions, nor for errors in bonus rewards. DraftKings reserves the right to exclude or remove certain customers from this Promotion, as well as the right to withhold bonus rewards if you have violated or attempted to violate the Promotion Terms or DraftKings Terms of Use, including but not limited to sharing account credentials with other individuals, placing wagers on behalf of other individuals, circumventing DraftKings age and location verification procedures, and abusing the DraftKings Platform, the Services, or any bonuses, the refer-a-friend program, or



*Figure 9: The full terms of use for the promotion pictured in Figure 6. If a user navigates to these terms through the obscured hyperlink, they are met with an impractically small font size.*

171.    Regulators are increasingly catching on to the misleading language DraftKings and other sportsbooks use in advertising "risk-free" bets. Several illustrative examples are discussed below.

172.    In Ohio, gambling regulators have said such "free" or "risk-free" inducements are "false, misleading and explicitly against" state law. Matthew Schuler, executive director of Ohio's Casino Control Commission, recently said: "If something is claiming to be free or risk-free, then it has to absolutely not require the patron to incur any loss or risk their own money." Disclosing the risks within the terms and conditions isn't good enough, he added. "We are not

supportive of trying to put the truth in small print."[19]

173.    DraftKings was sent a notice of violation by the Ohio Casino Control Commission which included a penalty of $150,000 for the use of "Risk-Free Bet" language. Previously, DraftKings had received a notice of violation from the same commission for advertising to individuals under the age of twenty-one.

174.    In 2022, the New York Attorney General's office admonished: "Since online sports gambling became legal in New York last month, New Yorkers have been bombarded with misleading ads on social media and streaming sites that claim 'risk-free' bets and '$1,000 welcome offers,' which sound like free money, but often come with strings attached without consumers' awareness."[20]

175.    The Massachusetts Gaming Commission prohibits sportsbooks from running promotions advertised as "free" or "risk-free" if a bettor needs to risk their own money as part of the promotion. *See* 205 Mass. Code Regs. § 256.04. Colorado has imposed a similar prohibition. *See* 1 Colo. Code Regs. § 207-2:9.4.

176.    Even the NBA took a stance on the "risk-free" language, banning it on platforms operated by the NBA or its franchises in February of 2023.[21]

177.    Many of the sportsbooks, including DraftKings, started to quietly move away from explicit "risk-free" language in late 2022. In that year, DraftKings pivoted to labeling

---

[19] Danny Funt, *Sportsbooks call them risk-free bets. Just don't read the fine print.*, WASHINGTON POST, Dec. 26, 2022, https://www.washingtonpost.com/sports/2022/12/26/risk-free-bets-mgm-draft-kings-fanduel-caesars/ (last visited Nov. 17, 2024).

[20] *CONSUMER ALERT: Attorney General James Warns New Yorkers of Deceptive Online Sports Betting Companies Ahead of Super Bowl*, NEW YORK ATTORNEY GENERAL, Feb. 10, 2022, https://ag.ny.gov/press-release/2022/consumer-alert-attorney-general-james-warns-new-yorkers-deceptive-online-sports#:~:text=Since%20online%20sports%20gambling%20became,strings%20attached%20without%20consumers%20awareness (last visited Nov. 17, 2024).

[21] Bill King, *Concerned about betting's inherent dangers, NBA to ban 'risk free' advertising*, SPORTS BUSINESS JOURNAL, Feb. 6, 2023 https://www.sportsbusinessjournal.com/Journal/Issues/2023/02/06/Upfront/betting.aspx (last accessed Nov. 21, 2024).

these offers "No Sweat" bets. These promotions are materially no different, and just as misleading, as their "Risk-Free" predecessors, particularly considering that consumers in Pennsylvania still associate these offers, however labeled, with the "Risk-Free" promotion campaigns that were incessantly advertised on countless NFL, NBA, NHL, and MLB games. Nevertheless, DraftKings has continued to imply that betting on its platform can be no-risk as recently as December 2024.



*Figure 10: A "No Sweat" NBA offer on the DraftKings Sportsbook app from December 4,*
*2024.*

178.    According to a Washington Post article, industry participants admitted publicly
that advertising offers as no-risk was "unclear."

179.    Nevertheless, DraftKings continued to make these offers because it expected and
intended consumers to be misled by its "Risk-Free" and "No Sweat" promotions.

180.    At no time in DraftKings's marketing or during DraftKings's sign-up or
promotion opt-in processes were Plaintiffs Macek, Setton, and Walker, and the Class Members
warned of the true financial risks of using DraftKings's services to place a bet, including the
immediate and acute risk of losing the entire amount in that initial bet, the risk that losses would
never be reimbursed by Defendant, or the risks of developing a gambling addiction.

181.    As described above, Defendants' marketing (including during the user sign-up
process) misrepresented and omitted several key facts about the "No Sweat" bet promotions.

182.    Because a "Bonus Bet" must be gambled quickly and cannot be deposited in the
customer's bank account as cash, there is nothing free of risk about the transaction.

183.    However, customers like Plaintiffs Macek, Setton, and Walker were misled into
thinking that they could bet without risk and then ended up losing all of their initial stake.

184.    For example, Plaintiff Macek recalls that he was surprised and dismayed to
discover the bet he placed pursuant to the "risk-free" promotion was not actually risk free and,
as described above, required him to place more wagers after he lost this bet just to have a
chance to win back some of the money he lost. He ultimately lost all the money he first bet
pursuant to a "risk-free bet" promotion.

185.    Had Plaintiffs Macek, Setton, and Walker and Class Members understood the

true risk inherent in making these "risk-free bets," they would have acted differently and not lost as much money.

**E. DraftKings's $1,000 Sportsbook Deposit Promotions**

186.    No-risk bet offers are not the only deceptive promotions that DraftKings sportsbook employs. For several years, DraftKings has also been promising $1,000 to new customers that sign up for its online sportsbook.

187.    Since at least 2020, DraftKings has advertised their promises of a "$1,000 Sign Up Bonus" to countless Pennsylvanians watching televised MLB, NFL, NBA, and NHL games, and have made themselves regulars on the Twitter, Instagram, Facebook, and TikTok feeds of their millions of followers.

188.    DraftKings also advertised sign-up bonuses on billboards and public transportation in Pennsylvania.

189.    Through July 15, 2025, the top banner on DraftKings's website reads:



*Figure 11: Screen Capture from DraftKings's Website on June 21, 2023*

*(*https://web.archive.org/web/20230621141013/https://sportsbook.draftkings.com/featured*)*

190.    Likewise, any user who downloaded the DraftKings app in 2023 was met with the following offer:

41



*Figure 12: Screen Capture of first page user saw in 2023 upon opening DraftKings's app.*

191.    Plaintiffs Macek, Setton, and Walker all saw a substantially similar offer when they first downloaded the DraftKings app and created their accounts.

192.    Plaintiffs relied on and were deceived by the representations in this offer and in similar advertisements when they created accounts and made deposits on the DraftKings Sportsbook to obtain the promised $1,000 bonus. They would not have created accounts on DraftKings or deposited and lost as much money had they not relied on and been deceived by the misleading statements in these advertisements.

193.    The unfair and deceptive terms of this promotion, which DraftKings offers to this day, make it inordinately unlikely for a customer to obtain the advertised $1,000 bonus. Omitted from the promising headline is the reality that DraftKings will only match 20% of a user's deposit and will only award 1 non-withdrawable site credit for every $25 that the customer wagers.

194.    In plain terms—which the fine print regarding this promotion deliberately obscures and the large-print advertisements for this promotion completely misrepresent—in order for a user to get a $1,000 bonus, they actually need to ***make an <u>initial deposit of $5,000 in one lump sum</u>*** (*i.e.* 5x the promised $1,000), and then ***risk <u>$25,000</u>*** (*i.e.* 25x the initial deposit) on DraftKings sports bets ***within <u>90 days</u>***.

195.    Additionally, to satisfy the playthrough requirement, DraftKings requires that customers make wagers on bets with minimum odds of -300 (meaning a bettor must risk $300 to win $100). This means bettors must place a series of highly-risky bets to satisfy the playthrough requirements.

196.    None of the foregoing is adequately disclosed to the customer.

197.    A new user is statistically likely, even using the most conservative betting approach, to lose money trying to satisfy the playthrough requirements.

198.    But even if they make it through all those steps, the $1,000 bonus is not rewarded as withdrawable cash funds, but rather as site credits (*i.e.* "DK Dollars") that hold no cash value, are non-withdrawable, non-transferable, non-refundable, and can only be used for further gambling.

199.    DraftKings's advertising of the $1,000 Sportsbook Deposit Promotion is also unfair and deceptive because an eligible consumer, who is often a new participant in sports betting, would be unlikely to understand the cost and risk involved in obtaining the $1,000 bonus.

200.    DraftKings advertised the "$1,000 Bonus" as a reward for signing up for its Sportsbook platform in these terms:



*Figure 13: DraftKings post on Twitter, dated February 15, 2022, using fan-favorite NBA player*

*Paul Pierce to promote false promises of a "Deposit Bonus up to $1,000".*

*(https://x.com/DKSportsbook/status/1493660970870312967)*



*Figure 14: Screenshot from an advertisement typical of those broadcasted by DraftKings on television and digital media in Pennsylvania during the Class Period.*



*Figure 15: A Twitter post, dated April 20, 2022, featuring rapper Lil Wayne and promising customers that they can simply "Download the [DraftKings] app today and get a deposit bonus up to $1,000". (https://x.com/DKSportsbook/status/1516830656721993729)*

201.    Plaintiffs Macek, Setton, and Walker saw advertisements promising $1,000 for making a deposit on DraftKings's sportsbook shortly before they initially deposited funds in their accounts on DraftKings.

202.    Plaintiffs Macek, Setton, and Walker were misled by the advertising for the promotion and, as a result, deposited more money than they would have with DraftKings had they been informed of the actual terms of the promotion.

203.    The result was that Plaintiffs gambled and lost more money than they otherwise would have.

204.    As with the advertisements for No-Risk Bet and Casino Deposit Match Promotion, the terms of the $1,000 Sportsbook Deposit Promotion are not fully disclosed in the advertisements and, to the extent that they are communicated, appear only in an illegibly small font-size—an order of magnitude smaller than the misleading text advertising the promotion—and are confusingly worded.

205.    Plaintiffs Macek, Setton, and Walker, and many other customers transferred money into their DraftKings accounts anticipating that their deposit would be "matched" in full up to $1,000.

206.    Plaintiffs Macek, Setton, and Walker never became aware that there were additional terms, much less saw the full terms of the promotion or learned that their funds would not be matched in U.S. Dollars, not be matched on a 1:1 basis, and would only be matched at a rate of one "DK Dollar" for every $25 USD wagered, until after they had made their deposits and opted into the promotion.

207.    Thus, in order to actually obtain the promised $1,000, customers would then have to go through the additional step of placing even more sportsbook wagers, and hope that they would win enough of those wagers to accrue $1,000 in their account—something that they were statistically unlikely to do.

208.    Plaintiffs Macek, Setton, and Walker, and other DraftKings customers did not

understand, and could not reasonably have been expected to understand, from the face of DraftKings's advertisements that, in order to receive a $1,000 bonus, he or she needed to immediately deposit $5,000 because the bonus amount is calculated as 20% of the consumer's first deposit.

209.    Plaintiffs Macek, Setton, and Walker, and other DraftKings sportsbook customers did not understand, and could not reasonably have been expected to understand, from the face of DraftKings's advertisements that the $1,000 bonus would not be provided at the time of their initial deposit, but that instead they would earn the bonus only 1 site credit at a time for every $25 wagered. Thus, to receive the $1,000 bonus, the new customer would have to risk $25,000 within 90 days on long-odds bets where to win $100 a customer would have to wager $300.

210.    Plaintiffs Macek, Setton, and Walker, and other DraftKings sportsbook customers did not understand, and could not reasonably have been expected to understand, from the face of DraftKings's advertisements that, in order to place bets for at least $25,000 over 90 days to qualify for the $1,000 bonus, they would have had to wager an average of more than $276 gambling on sports every day for three months.

211.    Plaintiffs Macek, Setton, and Walker, and other DraftKings sportsbook customers also did not understand, and could not reasonably have been expected to understand, from the face of DraftKings's advertisements that, despite the advertisements using dollar signs that conveyed that the bonus funds would be in the form of U.S. Dollars, the bonus would actually be awarded only as a non-withdrawable credit ("DK Dollars") to be used for further gambling.

212.    Plaintiffs Macek, Setton, and Walker, and other DraftKings sportsbook

customers also did not understand, and could not have reasonably been expected to understand, from the face of DraftKings's advertisements that they would be required to make bets with a high level of risk to satisfy the play-through requirements. They did not and could not have been reasonably expected to understand that not all bets they made on DraftKings Sportsbook would count toward the $1,000 bonus. In fact, any bets that DraftKings's oddsmakers believe have a greater than ~75% chance of winning would not count toward the required total bets of $25,000 within 90 days.

213.    Gambling regulators, like the New York Attorney General, have sounded warning bells about the misleadingness and illegality of deposit match promotions just like the ones DraftKings used on Pennsylvania residents.

214.    DraftKings knew, or should have known, that its advertisements for this promotion was deceptive to its target customers, who were mostly new to sports betting and who were extremely unlikely to understand the details of the promotion, even if it were conveyed clearly and in a font size that a reasonable consumer could be expected read on the company's advertisements and platform.

215.    DraftKings knowingly and intentionally designed this promotion to maximize the number of consumers that would sign up for its sports gambling platform, the number of bets that would be placed through the platform, and the amount of money that would be placed on bets through its platforms.

## CLASS ACTION ALLEGATIONS

216.    Plaintiffs Macek, Setton, Harner, Alicea, and Walker bring this action on behalf of themselves, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as representatives of the following class and subclasses, which is defined

as follows:

217.    **Casino Deposit Match Promotion Class:** Any person who participated in a DraftKings or Golden Nugget Casino Deposit Match Promotion and lost part or all of their initial deposit or winnings.

     a.    **Pennsylvania Casino Subclass:** any person in the Casino Deposit Match Promotion Class who entered the promotion while in the Commonwealth of Pennsylvania.

218.    **No-Risk Promotion Class:** Any person who opted into a DraftKings promotion advertising a "Risk-Free" or "No Sweat" bet with Defendant and lost their bet.

     a.    **Pennsylvania No-Risk Promotion Subclass:** any person in the No-Risk Promotion Class who placed the wager in the Commonwealth of Pennsylvania.

219.    **$1,000 Sportsbook Deposit Promotion Class:** Any person who deposited money in response to a DraftKings sportsbook "$1,000 Bonus" promotion for new customers.

     a.    **Pennsylvania $1,000 Sportsbook Deposit Promotion Subclass:** any person in the $1,000 Sportsbook Deposit Promotion Class who entered the promotion while in the Commonwealth of Pennsylvania.

220.    Excluded from these Classes are (a) Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; (b) class counsel and their employees; and (c) the judicial officers and Court staff assigned to this case and their immediate family members.

221.    The Class Period for each promotion class is tolled from August 2018 through the present under the continuing violation doctrine. DraftKings has engaged in an ongoing scheme to mislead consumers regarding the true terms of the promotions herein challenged. As

described more fully above, Plaintiffs have been misled and injured by the cumulative effect of DraftKings's misleading advertisements and promotions.

222.    Alternatively, the Class Period is tolled to the earliest limitations in any previously filed class action complaints against DraftKings raising the claims at issue here, which, on information and belief is the statutory limitations period running back from December 8, 2023.

223.    Alternatively, the Class Period is at least tolled to the original filing of a complaint in this Court by the same Plaintiffs raising these claims on April 18, 2025.

224.    The Class Period runs through the date of judgment in this case and includes any continuing violations that DraftKings engages in while this litigation is pending.

225.    This case is properly brought as a class action under Rule 23 for the following reasons:

a. **Ascertainability:** The Class Members can be readily identified through Defendants' records which will include a record of all those users who signed up for the promotion and must also track customer's state of residence. The members will be identified by filtering DraftKings's records for users from the relevant jurisdictions who entered into each of the identified promotions and lost money.

b. **Numerosity (Rule 23(a)(1)):** The Class is so numerous that joinder of all members in this action is impracticable. The exact number and identity of all Class Members is unknown by Plaintiffs at this time. However, Plaintiffs believe there are at least tens of thousands of Class Members. The number and identity of Class Members can be determined through discovery.

c. **Commonality and Predominance (Rule 23(a)(2)):** Plaintiffs and Class Members were all injured by the same unlawful conduct. Therefore, this action involved common questions of law and fact, which predominate over any questions affecting only individual Class Members, including, without limitation:

- Whether DraftKings misrepresented in its advertisements that Plaintiffs and the other No-Risk Promotion Class Members would not be at risk of losing money when they made a deposit and placed a first bet;

- Whether DraftKings intentionally designed its advertisements for the no-risk bet in such a way as to mislead Plaintiffs and the other No-Risk Promotion Class Members in order to induce them to sign up and wager;

- Whether DraftKings's representations and omissions about the no-risk promotions are false, misleading, deceptive, or likely to deceive;

- Whether DraftKings misrepresented in its advertisements the material terms of the $1,000 Sportsbook Deposit Promotion it was offering to Plaintiffs and the other $1,000 Sportsbook Deposit Promotion Class Members:

- Whether DraftKings intentionally designed its advertisements for these promotions in such a way as to mislead Plaintiffs and the other Class Members in order to induce them to sign up and make more bets than they otherwise would have;

- Whether DraftKings's representations and omissions about the Casino Deposit Match Promotion are false, misleading, deceptive, or likely to deceive;

- Whether DraftKings adequately disclosed the facts and/or risks concerning the use of its Casino Deposit Match Bonus;

- Whether DraftKings's actions violate state statutory laws regarding unfair business practices invoked herein;

- Whether DraftKings's actions violate the common law causes of action invoked herein;

- The appropriate measure of damages to award Plaintiffs and the other Class Members; and

- The appropriate injunctive relief to which Plaintiffs and the other Class Members are entitled.

d. **Typicality (Rule 23(a)(3)):** Plaintiffs' claims are typical of those of the other Class Members' claims because Plaintiffs and each of the other Class Members were injured in the same way by the deceptive promotion at issue. The promotions identified were widely distributed by DraftKings over a long period of time with consistent terms and the promotions that Plaintiffs responded to do not materially differ from promotions that any other Class Member would have responded to. The misrepresentations at issue were substantially uniform in content, presentation, and impact upon Plaintiffs and Class Members. Plaintiffs' injuries have been caused by the same conduct of DraftKings, which would provide the same basis for a claim for all Class Members.

53

e. **Adequacy of Representation (Rule 23(a)(4)):** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class Members whom they seek to represent. Plaintiffs intend to vigorously prosecute this action, and Class Members' interests will be fairly and adequately protected by Plaintiffs and their chosen counsel. Plaintiffs have retained counsel that is competent and experienced in complex class action and consumer protection and Plaintiffs' counsel will devote the time and financial resources necessary to vigorously prosecute this action. Neither Plaintiffs nor their counsel have any interests adverse to the Class.

f. **Superiority (Rule 23(b)(3)):** A class action is superior to individual adjudications because joinder of all Class Members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. Furthermore, the amount-in-controversy for many individual Class Member is likely relatively small, and if each Class Member were required to file an individual lawsuit, Defendant would necessarily gain a significant and unfair advantage since it would be able to exploit and overwhelm the limited resources of each individual plaintiff with its vastly superior financial and legal resources. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each Class Member. This is an appropriate forum in which to litigate these claims, as the Pennsylvania state population and the Class Members are concentrated in this forum. Finally, there are no particular difficulties presented by the management

or trial of this action as a class action.

    g.   **Declaratory and Injunctive Relief (Rule 23(b)(2)):** DraftKings acted or

refused to act on grounds generally applicable to Plaintiffs and the other Class

Members, such that final injunctive and declaratory relief is appropriate with

respect to the Class as a whole.

## **FIRST CAUSE OF ACTION**
**Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**("UTCPL") —Misleading and Deceptive Advertisements, 73 P.S. § 201–1, *et seq.* (Asserted**
**on behalf of Casino Deposit Match Promotion Class)**

226.    Plaintiffs Setton, Harner, Alicea, and Macek repeat and reallege the other

allegations in this Complaint as if fully set forth herein.

227.    Plaintiffs Setton, Harner, Alicea, and Macek bring this claim against DraftKings

under the Pennsylvania UTCPL, 73 P.S. § 201–1, *et seq.*, individually and on behalf of the

Pennsylvania Casino Deposit Match Promotion Sub-Class.

228.    Plaintiffs also bring this claim under the unfair and deceptive trade practices

statutes of the other states in which DraftKings has offered this promotion including Michigan,

Connecticut, New Jersey, and West Virginia. *See* Mich. Comp. Laws § 445.903(1); Conn. Gen.

Stat. § 42-110b(a); N.J. Stat. §§ 56:8–1 *et seq.*; and W. Va. Code §§ 46A-6-101 *et seq.*

229.    The UTCPL declares unlawful "Unfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce," 73 P.S. § 201–3(a)

including "any other fraudulent or deceptive conduct which creates a likelihood of confusion or

of misunderstanding." 73 P.S. § 201–2(4)(xxi).

230.    The services and product offered to Plaintiffs Setton, Harner, and Macek and

each member of the Class constitutes "trade or commerce" as defined by 73 P.S. § 201–2(3).

231.    Plaintiffs Setton, Harner, Alicea, and Macek and Class Members are therefore

entitled to the protections and remedies provided for by the UTCPL.

232.    DraftKings promulgated false and deceptive promises and misrepresentations in its advertisements for the Casino Deposit Match Promotion.

233.    Defendants' advertisements suppressed and omitted material facts as to the terms of the promotion, including not including in readable print the terms of the promotions anywhere in advertisements about them.

234.    This suppression and omissions were knowing and intentional.

235.    Defendants' conduct also violated Pennsylvania law because its advertisements affirmatively and falsely represented that consumers were likely to receive a cash-value match of their deposit of as much as $2,000 when, in fact, DraftKings knew it was unlikely that consumers would ever qualify for such a match.

236.    In particular, Defendants engaged in misrepresentation when they failed to include in the advertisement any warning regarding the large play-through requirements for the bonus promotion or any mention of the risk that a consumer's initial deposit would be forfeit if they began but did not complete the promotion.

237.    These advertisements created a likelihood of confusion and misunderstanding among consumers.

238.    These misrepresentations were material because they were likely to deceive reasonable consumers—often uninitiated in the industry of online gambling—about the nature of its signup bonus offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiffs Setton, Harner, Alicea, and Macek and Class Members.

239.    DraftKings intended that Plaintiffs Setton, Harner, Alicea, and Macek and Class

Members be misled by these misrepresentations and omissions.

240.    Plaintiffs Setton, Harner, Alicea, and Macek would not have wagered as much or as frequently on DraftKings were it not for DraftKings's misrepresentations regarding this promotion.

241.    Plaintiffs Setton, Harner, Alicea, Macek and Class Members deposited money, opted into the casino deposit match bonus and began betting on the casino without realizing the consequences of their doing so because of DraftKings's misleading advertising and deceptive conduct.

242.    As a result of Defendants' misconduct, Plaintiffs Setton, Harner, Alicea, and Macek and Class Members suffered ascertainable losses.

243.    In light of the foregoing, Defendants violated the UTCPL.

244.    Plaintiffs Setton, Harner, Alicea, and Macek and Class Members bring this action pursuant to 73 P.S. § 201–9.2 and, in accordance therewith, are entitled to compensatory damages, statutory treble damages in an amount to be determined at the time of trial, attorney fees, and court costs.

## SECOND CAUSE OF ACTION
### Intentional Misrepresentation (Asserted on behalf of Casino Deposit Match Promotion Class)

245.    Plaintiffs Setton, Harner, Alicea, and Macek repeat and reallege the other allegations in this Complaint as if fully set forth herein.

246.    Plaintiffs Setton, Harner, Alicea, and Macek bring this claim against DraftKings individually and on behalf of all Class Members.

247.    As described above, Defendants made material misrepresentations regarding the Casino Deposit Match Promotion.

248.    Defendants knew these representations were false and made them intentionally with the intention that users like Plaintiffs Setton, Harner, Alicea, and Macek and Class Members would rely on them in signing up for the promotion.

249.    These representations were material, in that a reasonable viewer would rely on them when deciding to proceed with creating and funding an account on DraftKings's platform and placing a bet in reliance on the promotion.

250.    Plaintiffs Setton, Harner, Alicea, and Macek and Class Members did rely on these misrepresentations when they deposited money, opted into the casino deposit match bonus and began betting on the casino without realizing the consequences of their doing so.

251.    Defendants, in promoting and marketing DraftKings to consumers, had a duty of care to reasonably disclose and inform customers of material dangers and risks of the DraftKings service and to not mislead its customers and the public at large about its offerings, particularly as a leading competitor in a highly regulated industry.

252.    Plaintiffs Setton, Harner, Alicea, and Macek and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law in a highly regulated industry.

253.    As a state licensed betting platform, Defendants knew or should have known that its representations in marketing materials about the promotion were inaccurate and misleading. Defendants had no reasonable grounds for believing its misrepresentations were not false or misleading and was careless and negligent in not ascertaining the truth of its misrepresentations and their effect on consumers before making them.

254.    Neither Plaintiffs Setton, Harner, Alicea, and Macek nor any reasonable consumer would have used Defendants in the same way if they had known of the true operation and risks of Defendants' service—risks the Defendants alone were aware of and misrepresented.

255.    As a direct and proximate result of Defendants' misrepresentations, Plaintiffs Setton, Harner, and Macek and members of the Classes were induced into Defendants' service and have been harmed and suffered actual damages in the amount of unrecouped losses incurred as a result of an initial bet.

256.    Plaintiffs Setton, Harner, Alicea, and Macek seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations, including compensatory damages and costs.

**THIRD CAUSE OF ACTION**
**Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law—**
**Misleading and Deceptive Advertisements, 73 P.S. § 201–1, *et seq.* (Asserted on behalf of**
**Pennsylvania No-Risk Promotion Class)**

257.    Plaintiffs Macek and Walker reasserts, realleges, and incorporates by reference all other paragraphs in the complaint.

258.    Plaintiffs bring this claim individually and on behalf of all other Class Members under the UTCPL.

259.    DraftKings's conduct was unfair and deceptive in that DraftKings used and employed deception, false promises, and misrepresentations about the nature of the no-risk promotions.

260.    DraftKings's conduct was also unfair and deceptive in that DraftKings used and employed concealment, suppression, and omission of material acts as to the nature of the no-risk promotions.

261.     DraftKings's conduct violated Pennsylvania law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers could place bets without risking their own money when, in fact, this was not the case.

262.     DraftKings's conduct also violates the Pennsylvania gambling regulations as described above.

263.     DraftKings's advertisements and promotions created a likelihood of confusion and misunderstanding among consumers.

264.     DraftKings's misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online sports gambling—about the nature of its no-risk offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiffs and Class Members.

265.     DraftKings intended that Plaintiffs and Class Members be misled by the misrepresentations and omissions in its no-risk promotions.

266.     DraftKings induced Plaintiffs and Class Members to rely on its misrepresentations and omissions.

267.     Without the misrepresentation and omissions in DraftKings advertising, Plaintiffs and the No-Risk Promotion Class Members would not have created accounts with DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed as many or as large of bets on DraftKings's platform.

268.     As a direct and proximate result of DraftKings's unfair and deceptive practices, Plaintiffs and the No-Risk Promotion Class Members suffered injuries in the form of monetary

losses when they failed to receive cash refunds for bets they placed and lost in reliance on DraftKings "Risk-Free" and "No Sweat" promotions.

269.    Plaintiff Macek and other Class Members' developing gambling addictions were also a direct and proximate result of these misleading and deceptive promotions, which were designed to inculcate gambling addictions in DraftKings's users.

270.    These acts caused substantial monetary injury to Plaintiffs and the members of the No-Risk Promotion Class that they could not reasonably avoid.

271.    DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiffs and the No-Risk Promotion Class. DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intentional, and/or done with reckless indifference with respect to the rights of Plaintiffs and the No-Risk Promotion Class.

272.    DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the Class and will continue to both damage Plaintiffs and the No-Risk Promotion Class and deceive the public unless enjoined by this Court.

273.    Plaintiffs and the No-Risk Promotion Class seek relief under the Pennsylvania UTCPL, including (but not limited to) actual damages, compensatory damages, statutory treble damages, restitution, penalties, injunctive relief, punitive damages, and attorney's fees and costs.

## FOURTH CAUSE OF ACTION
**Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law—Misleading and Deceptive Advertisements, 73 P.S. § 201–1, et seq.  (Asserted on behalf of Pennsylvania $1,000 Sportsbook Deposit Promotion Class)**

274.    Plaintiffs Macek and Walker repeat and reallege the other allegations in this Complaint as if fully set forth herein.

275.    Plaintiffs bring this claim against DraftKings under the UTCPL, individually and on behalf of the Pennsylvania $1,000 Sportsbook Deposit Promotion Class.

276.    DraftKings's conduct was unfair and deceptive in that DraftKings used and employed deception, false promises, and misrepresentations about the nature of the deposit match promotions.

277.    DraftKings's conduct was also unfair and deceptive in that DraftKings used and employed concealment, suppression, and omission of material facts as to the nature of the deposit match promotions.

278.    DraftKings's sportsbook "$1,000 Bonus" offer is also unfair and deceptive because Plaintiffs and the members of the Class were required to act differently than they could reasonably expect based on the advertisements in order to obtain the promised bonus. Plaintiffs and the members of the Class were required to deposit and wager large sums of money in a manner designed by Defendant to induce repeated exposure to a known addictive product.

279.    DraftKings's conduct violated Pennsylvania law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers would receive a cash-value match of their deposit when, in fact, this was not the case.

280.    DraftKings advertised its promotion with no intent to sell its services as advertised.

281.    DraftKings's advertisements and promotions created a likelihood of confusion and misunderstanding among consumers.

282.    DraftKings's misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online sports gambling—

about the nature of its signup bonus offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiffs and Class Members.

283. DraftKings intended that Plaintiffs and Class Members be misled by the misrepresentations and omissions in its signup bonus promotions.

284. DraftKings induced Plaintiffs and Class Members to rely on its misrepresentations and omissions.

285. Without the misrepresentations and omissions in DraftKings advertising, Plaintiffs and Deposit Match Promotion Class Members would not have created accounts with DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed as many or as large of bets on DraftKings's platform.

286. As a direct and proximate result of DraftKings unfair and deceptive practices, Plaintiffs and Signup Bonus Promotion Class Members suffered injuries in the form of monetary losses when they failed to receive $1,000 or the full cash value of the funds they deposited into their new DraftKings accounts in response to the promotion.

287. These acts caused substantial injury to Plaintiffs and the members of the Deposit Match Promotion Class that they could not reasonably avoid.

288. DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiffs and the Deposit Match Promotion Class. DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intentional, and/or done with reckless indifference with respect to the rights of Plaintiffs and the Deposit Match Promotion Class.

289. DraftKings's conduct has caused and is causing immediate and irreparable

injuries to Plaintiffs and the Deposit Match Promotion Class and will continue to both damage Plaintiffs and the Class and deceive the public unless enjoined by this Court.

290.    Plaintiffs and the Class seek relief under the Pennsylvania UTCPL, including (but not limited to) actual damages, compensatory damages, statutory treble damages, restitution, penalties, injunctive relief, punitive damages, and attorney's fees and costs.

### FIFTH CAUSE OF ACTION
**Intentional Misrepresentation (Asserted on behalf of No-Risk Promotion Class)**

291.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

292.    DraftKings has intentionally represented that it will ensure that customers will not be liable for losing initial bets. Although DraftKings advertised that consumers could place a "risk free" or "no sweat" bet these representations were false. Despite this representation, the promotions in fact carry a substantial risk of loss and when users lose their first bet, they receive credits with no cash value that may never allow them to recoup their initial losses. Therefore, Defendants misrepresented the promotional offers.

293.    These representations were material, in that a reasonable viewer would rely on them when deciding to proceed with creating and funding an account on DraftKings's platform and placing an initial bet in reliance on the promotion.

294.    Defendants, in promoting and marketing DraftKings to consumers, had a duty of care to reasonably disclose and inform customers of material dangers and risks of the DraftKings service and to not mislead its customers and the public at large about its offerings, particularly as a leading competitor in a highly regulated industry.

295.    At all relevant times when Defendants made such representations, Defendants knew that the representations were misleading, or acted recklessly in making the

representations, without regard for their truth or falsity.

296.    DraftKings knew and intended that Plaintiffs and members of the Classes would rely upon its misrepresentations when deciding whether to wager on DraftKings.

297.    DraftKings intended its consumers to rely on these misrepresentations. It could have honestly represented the terms of its promotion: "if you lose, you'll get an expiring bonus bet that will not pay back the stake if it wins." But DraftKings knew that such an offer would not entice customers to bet more money or more frequently.

298.    Plaintiffs and Class Members did rely on these misrepresentations in placing bets on DraftKings' platform.

299.    Plaintiffs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law in a highly regulated industry.

300.    As a state licensed sports betting platform, DraftKings knew or should have known that its representations in marketing materials about its service being without risk are inaccurate and misleading. DraftKings had no reasonable grounds for believing its misrepresentations were not false or misleading and was careless and negligent in not ascertaining the truth of its misrepresentations and their effect on consumers before making them.

301.    Plaintiffs and Class Members acted in reliance upon Defendants' false and misleading statements by signing up for and using the DraftKings service to make initial bets.

302.    Neither Plaintiffs nor any reasonable consumer would have used DraftKings in the same way if they had known of the true operation and risks of DraftKings's service—risks

the Defendants alone were aware of and misrepresented.

303.    As a direct and proximate result of DraftKings's misrepresentations, Plaintiffs and members of the Classes were induced into using DraftKings's service and have been harmed and suffered actual damages in the amount of unrecouped losses incurred as a result of an initial bet.

304.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations, including compensatory damages and costs.

## SIXTH CAUSE OF ACTION
**Intentional Misrepresentation (Asserted on behalf of Deposit Match Promotion Class)**

305.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

306.    DraftKings has intentionally misrepresented that it will ensure that customers would receive a cash match of their initial deposit up to $1,000. These representations were false. Consumers actually received only a percentage of their deposit *only if* they wagered their initial deposit amount twenty-five times on long-odds bets. Even then, consumers only received "DK Dollars", not redeemable for cash and not treated like normal bets. Therefore, Defendants misrepresented the promotional offers.

307.    These representations were material in that a reasonable viewer would rely on them when deciding to proceed with creating and funding an account on DraftKings's platform and placing an initial bet in reliance on the promotion.

308.    Defendants, in promoting and marketing DraftKings to consumers, had a duty of care to reasonably disclose and inform customers of material dangers and risks of the promotion and to not mislead its customers and the public at large about its offerings, particularly as a leading competitor in a highly regulated industry.

309.    At all relevant times when Defendants made such representations, Defendant knew that the representations were misleading, or acted recklessly in making the representations, without regard for their truth or falsity.

310.    DraftKings knew and intended that Plaintiffs and members of the Classes would rely upon its misrepresentations when deciding whether to deposit and wager on DraftKings.

311.    Plaintiffs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law in a highly regulated industry.

312.    As a state licensed sports betting platform, DraftKings knew or should have known that its representations in marketing materials about deposit matches are inaccurate and misleading. DraftKings had no reasonable grounds for believing its misrepresentations were not false or misleading and was intentional or reckless in advertising those misrepresentations.

313.    Plaintiffs and members of the Classes acted in reliance upon Defendants' false and misleading statements by signing up for and using the DraftKings service to make initial bets. prior to making them.

314.    Neither Plaintiffs nor any reasonable consumer would have initially deposited as much money on DraftKings if they had known the true terms of the signup bonus promotion that DraftKings misrepresented.

315.    As a direct and proximate result of DraftKings's misrepresentations, Plaintiffs and members of the Classes were induced into wagering more money and more frequently than they otherwise would have and have been harmed and suffered actual damages in the amount of unrecouped losses incurred as a result.

316.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations, including compensatory damages and costs.

<b><u>SEVENTH CAUSE OF ACTION</u></b>
<b>Unjust Enrichment (Asserted on behalf of all Classes)</b>

317.    Plaintiffs repeats and realleges the other allegations in this Complaint as if fully set forth herein.

318.    Plaintiffs bring this claim against Defendants individually and on behalf of all Class Members.

319.    As alleged herein, Defendant has intentionally and/or recklessly made misleading misrepresentations to Plaintiffs and Class Members to induce them to create accounts and place bets on its platform.

320.    As further alleged herein, DraftKings created and implemented a scheme to increase its share of the legal gambling market through a pervasive pattern of deceptive and unfair conduct including with deceptive advertising.

321.    DraftKings was unjustly enriched as a result of its wrongful conduct, including through the false and misleading promises that: (i) DraftKings would give users an amount equal in U.S. dollar value to their deposit when they opted into the Casino and Sportsbook Deposit Match Promotions; (ii) customers could cancel the Casino Deposit Match Promotion without losing their initial deposit; and (iii) that certain bets on DraftKings could be placed at no-risk to the user.

322.    Plaintiffs and the Class Members reasonably relied on these misleading representations and have not received the benefits promised by Defendant.

323.    Plaintiffs and the Class Members therefore have been induced by DraftKings's misleading and deceptive representations about the promotional offers and have paid more

68

money to DraftKings to place bets than they otherwise would and/or should have paid.

324.    Plaintiffs and the Class Members have conferred a benefit upon Defendant as Defendant has retained monies paid to them by Plaintiffs and the Class Members.

325.    The money DraftKings received was obtained under circumstances that were unfair and at the expense of Plaintiffs and the members of the Class Members.

326.    Therefore, it is inequitable and unjust for DraftKings to retain the profit, benefit, or compensation conferred upon it without paying Plaintiffs and the Class Members back for the difference of the full value of the benefits compared to the value actually received.

327.    As a direct and proximate result of DraftKings's unjust enrichment, Plaintiffs and Class Members are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by DraftKings from its deceptive misleading, and unlawful conduct as alleged herein.

328.    Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, demands a jury trial on all claims so triable and judgment as follows:

A. Certifying the proposed Classes, appointing Plaintiff Macek and Setton as representative of each of the asserted Classes, appointing Plaintiffs Alicea and Harner as representatives of the Casino Deposit Match Class, appointing Plaintiff Walker as representative of the Risk-Free and $1,000 Sportsbook Deposit Promotion Classes, and appointing counsel for Plaintiffs as Class Counsel;

B. Declaring that Defendants are financially responsible for notifying the Class

Members of the pendency of this suit;

C.  Declaring that Defendant's policies and practices as described herein constitute a violation of the state consumer protection statutes;

D.  Enjoining Defendant from the wrongful conduct as described herein;

E.  Awarding actual and/or compensatory, multiple, punitive (as available according to law), and statutory damages;

F.  Awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

G.  Awarding pre- and post-judgment interest to the extent the law allows; and

H.  Awarding such further relief as this Court may deem just and proper.

## **DEMAND FOR A JURY TRIAL**

Plaintiffs hereby demand trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: July 15, 2025                    Respectfully submitted,

*/s/ Amelia Maxfield*

Counsel for Plaintiffs

**LOEVY & LOEVY**
Michael Kanovitz (*pro hac vice application forthcoming*)
Jon Loevy (*pro hac vice application forthcoming*)
Isaac Green (*pro hac vice application forthcoming*)
Aaron Tucek (*pro hac vice application forthcoming*)
Alexandra Wolfson (*pro hac vice application forthcoming*)
311 N Aberdeen Street, Suite 3
Chicago, IL 60607
(312) 243-5900
mike@loevy.com

70

Amelia Maxfield
1712 N Street NW Ste. 401
Washington DC 20011
(312) 243-5900

**PUBLIC HEALTH ADVOCACY
INSTITUTE**

Jacob B. Wolk (MA BBO #699263) (*pro hac
vice forthcoming*)
Andrew Rainer (MA BBO #542067) (*pro hoc
vice forthcoming*)
Mark Gottlieb (MA BBO #627008) (*pro hac
vice forthcoming*)
360 Huntington Avenue, CU117
Boston, MA 02115
(617) 373-2026
jacobwolk@phaionline.org
arainer@phaionline.org
mark@phaionline.org

## CERTIFICATION

I, Amelia Maxfield, the undersigned attorney of record for Plaintiff, do hereby certify that this

complaint was filed via electronic filing system and will be served on the Defendants. I further

certify, pursuant to Local Rule 53.2(3)(C) that the damages sought in this case exceed $150,000

exclusive of interests and costs.


Dated: July 15, 2025

*/s/ Amelia Maxfield*

LOEVY & LOEVY
311 N Aberdeen Street, Suite 3
Chicago, IL 60607
(312) 243-5900
maxfield@loevy.com

71